United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 10, 1999 Decided October 8, 1999 

 No. 98-1275

 Kootenai Electric Cooperative, Inc., et al., 
 Petitioners

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Public Utility District No. 2 of Grant County,
 Washington, et al., 
 Intervenors

 Consolidated with 
 98-1367

 On Petition for Review of Orders of the 
 Federal Energy Regulatory Commission

 Peter C. Kissel argued the cause for petitioners Kootenai 
Electric Cooperative, Inc., et al. With him on the briefs was 
Alan I. Robbins.

 Howard E. Shapiro argued the cause for petitioner The 
Grant County Purchasers Group and intervenor The Snake 
River Power Association, Inc. With him on the briefs were 
Gary D. Bachman and Adelia S. Borrasca.

 Adelia S. Borrasca argued the cause and was on the brief 
for intervenor The Snake River Power Association, Inc.

 Laura J. Vallance, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With her on 
the brief were Douglas W. Smith, General Counsel, Jay L. 
Witkin, Solicitor, and Susan J. Court, Special Counsel.

 William J. Madden, Jr. and John A. Whittaker, IV were 
on the brief for intervenor Public Utilities District No. 2 of 
Grant County, Washington.

 Before: Wald, Silberman, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: Two groups of petitioners seek 
review of the Federal Energy Regulatory Commission's 
(FERC's) order authorizing the future licensee of a hydro-
electric project to charge a market price for 30% of the 
project's power. We deny the petition.

 I.

 The Priest Rapids Project is a federally licensed hydroelec-
tric development located in Grant County, Washington; the 
current licensee, Grant County Public Utility District (Grant), 
has held the license since 1955. Grant entered into long-term 
contracts with one group of petitioners--the purchasers 
group--to provide them with 63.5% of the Project's firm 
power at a price determined by a cost-based formula. While 
both those contracts and Grant's license expire in 2005, Grant 
expects its license to be renewed, and has entered into 

contract negotiations for post-2005 power sales with the 
purchasers group on the basis of that expectation.

 This case arises from Grant's decision not to negotiate with 
the second group of petitioners--the Idaho cooperatives--
over the sale of power following relicensing. This rebuff led 
the Idaho cooperatives to file a complaint with FERC alleging 
that Grant had failed to comply with the 1954 Act authorizing 
construction of the dam. The Act, in relevant part, requires 
that the licensee offer "a reasonable portion of the power 
output of the project for sale within the economic marketing 
area in neighboring States and ... cooperate with agencies in 
such States to insure compliance with this requirement," in 
order to "assure that there shall be no discrimination between 
States in the area served by the project." See Pub. L. No. 
544, s 6, 68 Stat. 573, 574 (1954). The Idaho cooperatives 
sought an order requiring Grant to sell them approximately 
one-fifth of the Project's output, pursuant to FERC's authori-
ty under the Act to, "in the event of disagreement between 
the licensee and the power marketing agencies[,] determine 
and fix the applicable portion of power capacity and power 
output to be made available hereunder and the terms applica-
ble thereto."

 The purchasers group and Grant opposed the Idaho coop-
eratives' request, each claiming that the issue of allocation of 
power following relicensing would not be ripe until relicensing 
had occurred. The purchasers group also noted that their 
contracts with Grant provided them a right of first refusal to 
Project power that would be jeopardized by the cooperatives' 
desired relief, while Grant contended that the Act would not 
apply upon relicensing. FERC concluded that the Act would 
apply upon relicensing, and set the matter for a trial-type 
evidentiary hearing before an ALJ. See Kootenai Elec. 
Coop., Inc., et al. v. Public Util. Dist. No. 2, 72 FERC 
p 61,222 (1995). The Commission decided that the case was 
ripe, noting that Grant and the purchasers group were al-
ready engaged in negotiations for post-relicensing power 
sales. See id. at 62,032-33, reh'g denied, 73 FERC p 61,307 
at 61,858 (1995). Meanwhile, intervenor Snake River Power 
Association, a marketing agency selling power in the States of 

Idaho, Montana, Utah, Nevada, and Wyoming, entered the 
case to stake its claim to a post-relicensing allocation of 
power.

 The ALJ, without much discussion, decided that 30% of the 
Project's firm power should be sold to power marketing 
agencies serving Idaho, Oregon, and Montana, and fixed a 
percentage allocation for each party to the proceeding based 
upon the number of retail customers they would likely serve 
following relicensing. He noted that the Act requires sales to 
Washington's "neighboring States," and while no States but 
Idaho and Oregon directly border Washington, Montana is 
sufficiently mentioned in the legislative history that it should 
be deemed neighboring for purposes of the Act.

 The Commission upheld the ALJ's finding that a 30% 
allocation would satisfy the statute's "reasonable portion" 
requirement,1 noting that the percentages proposed by the 
parties were self-serving and that "nothing ... proscribes the 
Commission's discretion in determining what is a 'reasonable' 
portion." Kootenai Elec. Coop., Inc., et al. v. Public Util. 
Dist. No. 2, 82 FERC p 61,112 at 61,402 (1998). However, 
FERC, explaining that division of the allocation among the 
purchasers using any of the proposed numerical formulas 
would be "inherently arbitrary and fundamentally inconsis-
tent with the Commission's policy of promoting competition," 
decided that the future licensee would be required to allocate 
the power using a non-discriminatory market mechanism--
i.e., market pricing--with petitioners given first crack at 
purchasing the power. Id. Without deciding what "neigh-
boring States" meant, the Commission broadened the geo-
graphic scope of sales to include those States serviced by 
Snake River Power Association, reasoning that the Act's 
purpose would be best served by distributing power within 
the broader "economic marketing area."

__________
 1 The Commission expanded the ALJ's requirement to cover both 
firm and non-firm power, an issue not before us.

 None of the parties was completely satisfied with this 
order, and all requested a rehearing, with three different 
views as to which states qualify as "neighboring States" and 
four different views as to the appropriate allocation. All 
petitioners argued that use of a market mechanism is incon-
sistent with the Act, which they claim requires both that the 
power be sold at cost and that the Commission allocate the 
power itself. It was also claimed that their right of first 
refusal would be meaningless if the power were sold at a 
market price. Grant, which expects to be the future licensee, 
of course did not join in this argument, but rather asked the 
Commission to decrease the amount of power the licensee 
would be required to sell (Grant appears before us as an 
intervenor in support of respondent). The Commission de-
nied rehearing. See Kootenai Elec. Coop., Inc., et al. v. 
Public Util. Dist. No. 2, 83 FERC p 61,289 (1998).

 We consolidated separate petitions for review by the pur-
chasers group and the Idaho cooperatives. Though their 
arguments differ in certain respects, both claim that the 1954 
Act forbids use of a market mechanism to allocate the Pro-
ject's power, and that respondent did not engage in reasoned 
decisionmaking when it selected 30% as the reasonable por-
tion of power to be allocated; the Idaho cooperatives alone 
ask us to review the proper geographic scope of power 
distribution, i.e., the scope of the term "neighboring States." 
In addition to defending its order on the merits, the Commis-
sion asserts that petitioners lack standing and that this case 
is not ripe.

 II.

 We start, as of course we must, with the Commission's 
jurisdictional objections. FERC argues that the case is not 
ripe because the new license has not been awarded and one 
cannot know now what price the new licensee--Grant or 
another entity--would charge any purchaser. Petitioners cry 
foul; after all, they argue, FERC itself determined the 
controversy was ripe before it. But whether or not an 
agency determines a proceeding is "ripe" for its purposes, 

that conclusion is not determinative when the question is 
ripeness in a federal court. See Pfizer Inc. v. Shalala, 182 
F.3d 975, 979-80 (D.C. Cir. 1999). An agency is not bound to 
observe such judicial strictures, either constitutional or pru-
dential, as are Article III courts. See id.

 Nonetheless, we think the case is ripe for the same reasons 
that persuaded FERC when it was acting as an adjudicator. 
Although it is possible that another entity would be awarded 
the license rather than Grant, that contingency, as a practical 
matter, is too remote to trouble us. So too is the possibility 
that the market price for power would sink to a cost-based 
price. The important point is that the petitioners and Grant 
have entered the negotiation stage for post-relicensing power, 
and their respective bargaining power would be substantially 
altered if FERC's decision were reversed. Cf. Associated 
Gen. Contractors v. Coalition for Economic Equity, 950 F.2d 
1401, 1407 n.5 (9th Cir. 1991) (challenge to minority business 
preference ripe where contractors' bidding decisions would 
differ depending upon resolution of issue); Fort Sumter 
Tours v. Andrus, 564 F.2d 1119, 1123-24 (4th Cir. 1977) 
(challenge to denial of statutory preference ripe where denial 
affected negotiations for tour concession).

 Moreover, the question presented is in Abbott Laboratories 
terms "purely legal," and any decision we reach can hardly be 
thought of as interfering with agency deliberations; the Com-
mission has finally determined the issue. See Abbott Labora-
tories v. Gardner, 387 U.S. 136, 149 (1967); cf. Weinberger v. 
Salfi, 422 U.S. 749, 765 (1975). We therefore conclude the 
case is ripe.

 The standing issue, after oral argument, actually disap-
peared. The Commission had challenged petitioners' stand-
ing to protest the reasonableness of the allocation percentage 
and the Commission's failure to define "neighboring States." 
But petitioners freely admitted that if market pricing is 
legitimate they would have no particular interest or stake in 
the amount of power allocated to "purchasers," wherever they 
are. Power is fungible, and the output of the Priest Rapids 
project would have a trivial impact on the national market 

price. Since we determine that the Act does not preclude the 
Commission's market-rate authorization, the petitioners' al-
ternative claim is abandoned and therefore we never get to 
their standing to raise it.

 III.

 We are brought then to the core issue. Does this rather 
unusual statute require the Commission to set cost-based 
rates for the portion of the power Priest Rapids produces that 
is to be allocated to purchasers in neighboring states?2 In 
the administration of the basic Federal Power Act, FERC has 
since moved to a market-rate deregulatory posture.3 And as 
the parties recognize, FERC actually lacks authority to set 
the rates of state utilities under the FPA. See 16 U.S.C. 
s 824(f); Village of Bergen v. FERC, 33 F.3d 1385, 1387 (D.C. 
Cir. 1994). Petitioners' argument is that the special statute 
governing the construction of this project implicitly granted 
FERC rate-making authority; indeed obliges FERC to exer-
cise that authority notwithstanding the exemption for state 
utilities under the FPA, and notwithstanding the present 

__________
 2 Petitioners also make a rather frail argument that the Commis-
sion failed to provide them sufficient notice that it might settle on 
allocation via a market mechanism. But in Williston Basin Inter-
state Pipeline Co. v. FERC, 165 F.3d 54, 63-64 (D.C. Cir. 1999), we 
held that a pipeline company had sufficient notice that FERC might 
adopt GDP growth as a benchmark for price increases where 
FERC had given notice that it would set a benchmark at the 
hearing, even though FERC had never stated that it was consider-
ing using GDP growth as the benchmark. Since in this case all 
parties challenged the ALJ's allocation on exceptions to the Com-
mission, the possibility was left open that some other method of 
allocation would be adopted, and petitioners do not argue that the 
market is, in general, an unreasonable means of allocating a scarce 
resource.

 3 See Promoting Wholesale Competition Through Open Access 
Non-Discriminatory Transmission Services by Public Utilities; Re-
covery of Stranded Costs by Public Utilities, Order No. 888, FERC 
Stats. and Regs. 31,036 (1996).

deregulatory regime.4

 Nothing in the actual language of the Act explicitly re-
quires FERC to set cost-based rates--or any other kind of 
rates--but petitioners contend that the legislative history is 
instructive and there is language in the statute that necessari-
ly implies a congressional intent to require FERC to set cost-
based rates if the parties disagree. Petitioners never make 
clear whether they are claiming that the congressional intent 
is so specific that the case should be treated as a Chevron 
step I candidate, see Chevron U.S.A. Inc. v. Natural Re-
sources Defense Council, Inc., 467 U.S. 837 (1984), or whether 
they only contend that under Chevron step II the agency's 
interpretation is unreasonable. Be that as it may, petitioners 
rely primarily on the legislative history.

 There is no question that the legislative deliberations re-
flect a general understanding that the project would provide 
low-cost power to the Northwest. See, e.g., 100 Cong. Rec. 
10,215 (daily ed. July 10, 1954) (statement of Sen. Magnuson) 
("When we talk about more kilowatts for the Northwest, we 
also have in mind cheap kilowatts."); 100 Cong. Rec. 6,850 
(daily ed. May 19, 1954) (statement of Rep. Angell) ("[T]he 
power will be distributed equitably throughout the areas as is 
now the case under Federal procedure."); Priest Rapids and 
Cougar Hydroelectric Projects: Hearings on S. 1743 and S. 
2920 Before a Subcomm. of the Comm. on Public Works, 83d 
Cong., 2d Sess. 12 (May 20, 1954) ["May 20th Hearings"] 
("The effect of the House language is to insure ... that 
neighboring States get a fair share of the benefits produced 

__________
 4 The Idaho cooperatives alternatively argue that FERC cannot 
require the licensee to use market rates because the Federal Power 
Act excludes state utilities like Grant from FERC's rate-making 
authority. Since this argument was not presented to 
FERC, it is not properly before us.

by the licensee in this stretch of the river."). That under-
standing was premised, however, on governing state rate 
regulations that were and are typically cost based. Indeed, 
Congress assumed that the licensee as a non-profit agency 
would be obliged to sell at cost.5 This assumption, however, 
may no longer be accurate, since Grant informs us that it has 
been selling excess power at market prices. A congressional 
assumption about an existing state regulatory framework, as 
a backdrop against which it is legislating, does not translate 
into a congressional command that that regulatory backdrop 
shall remain controlling as to the subject of its legislation 
despite intervening regulatory changes. That would be a tiny 
legislative tail wagging a giant legislative dog. If Congress 
had intended the Act to include a requirement that FERC set 
rates at cost, it would have said something like it said in 
another special statute--that the rates be "just and reason-
able." See Farmers Union Cent. Exch., Inc. v. FERC, 734 
F.2d 1486, 1504 (D.C. Cir. 1984).

 Petitioners point to actual language in the statute that they 
argue at least implies that Congress intended FERC to set 
rates at cost. The Act imposes on the Commission the 
responsibility to "determine and fix the applicable portion of 
power capacity and power output to be made available here-
under and the terms applicable thereto." According to peti-
tioners, that language makes no sense if it was contemplated 
that FERC could simply authorize Grant to sell at market 
prices. Petitioners again have a point; the language does 
seem to assume a regulated rate. On the other hand, if 
Congress meant this provision to constitute an independent 
mandate on the Commission to set cost-based rates for the 
project, it would hardly have provided that such authority 
was triggered only by the parties' disagreement.

 Similarly unpersuasive is petitioners' suggestion that the 
nondiscrimination clause--"no discrimination between 

__________
 5 See May 20th Hearings at 13-14 ("First, the licensee is a 
nonprofit agency and therefore must sell power at cost: Second, 
power sold must be at a rate competitive with Bonneville [which 
sells power at cost] ...: Third, the cost of money to the licensee--
the interest rate--will reflect the licensee's status as a local govern-
ment agency." )

States"--is inconsistent with a market-based rate. One 
might think a nondiscrimination clause contemplates a below-
market rate. But again that notion goes to Congress' back-
ground assumption--not its command. In other words, the 
nondiscrimination clause serves a prophylactic purpose if 
below-market rates are required. But, we cannot say the 
clause mandates below market rates.

 It is even argued that FERC's position violates the non-
discrimination clause: Grant sells power to its own customers 
at cost (as required by state regulation) and therefore Wash-
ington consumers and consequently the State of Washington 
is preferred against its neighboring States. This reading of 
the nondiscrimination clause seems strained, however, since it 
reduces FERC's authority to "determine and fix ... the 
terms applicable" for sales to power marketing agencies to a 
requirement that FERC set terms equal to those Washington 
State requires for sales by its public utilities to local custom-
ers. We cannot say that this statute evinces a clear congres-
sional intent to impose a Most Favored Nation clause on the 
licensee--indeed, Congress considered and rejected an 
amendment that would have required sales to be "upon the 
same terms and conditions as power is offered for sale by the 
licensee in the State of Washington." May 20th Hearings at 
12.

 In sum, we think the statute is ambiguous; there is no 
clear congressional intent, and therefore the Chevron doctrine 
applies and we ask whether the Commission's interpretation 
is a permissible one. The question is not easy; if we were 
interpreting the statute de novo we might well conclude that 
petitioners have the better argument. But we are not, and 
we cannot say that FERC's interpretation is unreasonable. 
FERC logically concluded both that no discrimination would 
occur if power marketing agencies in each State were provid-
ed an equal opportunity to bid for the available power, and 
that it had fulfilled its statutory role of determining the 
portion of power to be made available to petitioners by 
requiring the future licensee to offer a "reasonable portion" of 
the power to them as a group.6

__________
 6 FERC's interpretation finds support in the legislative history. 
See May 20th Hearings at 12 ("[T]he Federal Power Commission 

 * * * *

 Accordingly, we deny the petition.

__________
may decide the issue, if there is a dispute between the licensee and 
power marketing agencies ... over what constitutes a reasonable 
portion.").