**PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**No. 88–1623.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1989.

Decided Nov. 17, 1989.

Brian D. O'Neill, with whom Raymond N. Shibley, Michael F. McBride and Bruce W. Neely, Washington, D.C., were on the brief, for petitioner.

Dwight Alpern, Atty., FERC, with whom Catherine C. Cook, Gen. Counsel, Joseph S. Davies, Deputy Sol., Washington, D.C., and Ethel Lenardson Morgan, Atty., FERC, were on the brief, for respondent.

Before EDWARDS, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Panhandle Eastern Pipe Line Company ("Panhandle") challenges two Federal Energy Regulatory Commission ("FERC" or "Commission") orders summarily dismissing certain tariff sheets filed by Panhandle. *See Panhandle E. Pipe Line Co.,* 43 F.E.R.C. ¶ 61,121 (1988), *reh'g granted in part and denied in part,* 43 F.E.R.C. ¶ 61,530 (1988). The tariff sheets proposed a scheme for allocating pipeline capacity between Panhandle and its wholly owned subsidiary, Trunkline Gas Company ("Trunkline"), as a means of implementing the rights of Panhandle customers to convert entitlements to *receive* gas purchased from Panhandle into entitlements to *transport* gas purchased directly from gas producers. The Commission found that the proposal violated both the right to nondiscriminatory transportation services and a Commission policy against "capacity brokering." Panhandle petitions for review on the ground that the Commission's orders are arbitrary and capricious.

On the record before us, we find merit in the petition for review. During the pendency of this appeal, the Commission significantly revised one of the legal norms on which its decision rested, making it impossible for the court to determine the status of Panhandle's tariffs. Even apart from this change in agency policy, moreover, the Commission's rejection of Panhandle's tariffs is not supported by reasoned decisionmaking. Consequently, the petition for review is granted and the case is remanded for further proceedings.

## I. BACKGROUND

### A. *Regulatory Framework*

This case arises from Panhandle's attempt to comply with Commission Order No. 436, 50 Fed.Reg. 42,408 (1985), F.E.R.C. Stats. & Regs., Regulations Preambles 1982–1985 ¶ 30,665 (codified in scattered sections of 18 C.F.R.).[1] Recognized as one of the "great[est] regulatory milestones of the [natural gas] industry," *Associated Gas Distribs. v. FERC,* 824 F.2d 981, 993 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), this regulation seeks to guarantee that the competitive conditions that now obtain in the "wellhead" or gas-production market will redound to the benefit of gas consumers. The order incorporates into FERC's licensing regime a variety of provisions intended to induce pipelines not to discriminate against customers who seek pipeline service to transport gas bought directly from gas producers rather than from the pipelines themselves. In the Commission's terms, Order 436 "unbundles" the pipelines' merchant and transportation functions. *See generally* F.E.R.C. Stats. & Regs., Regulations Preambles 1982–1985 ¶ 30,665, at 31,474.

A central component of Order No. 436 is the right of pipeline customers—predominantly local distribution companies—to convert their contractual entitlement to receive gas purchased from the pipelines into a

---

1. In *Associated Gas Distributors v. FERC,* 824 F.2d 981 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988), we approved most aspects of Order No. 436 but nonetheless vacated it in light of certain defects that we found to be inseparable from the operation of the order as a whole. *See id.* at 1044. FERC subsequently promulgated an interim rule, Order No. 500, 52 Fed.Reg. 30,334 (1987), III F.E.R.C. Stats. & Regs. ¶ 30,761 (1987), which readopted the approved portions of Order No. 436 and dispensed with or modified the portions condemned in *Associated Gas Distributors. See generally American Gas Ass'n v. FERC,* 888 F.2d 136, 142–46 (D.C.Cir.1989). The issue of whether Order No. 500 adequately responds to the concerns we expressed in *Associated Gas Distributors* is the subject of ongoing proceedings before this court. *See id.* at 152–53. The only matter at issue in this case is whether the Commission permissibly applied one aspect of the regulatory framework established by Orders No. 436 and No. 500; nothing in our decision should be read to bear on the question of whether the framework as a whole withstands review. For ease of reference, we will refer to the regulations collectively instituted by these two orders as "Order No. 436."

contractual entitlement to transport gas purchased from producers. *See* 18 C.F.R. § 284.10 (1988). Encouraged by Commission regulations and policies, many distribution companies entered into long-term "firm demand" contracts that obligate the pipelines to guarantee delivery of up to a particular amount of gas on demand ("contract demand") in return for a fixed fee ("demand charge") paid by the distribution companies regardless of how much gas they actually consume. *See generally Associated Gas Distribs.*, 824 F.2d at 1013.[2] Both the duration of these contracts and their demand-charge terms operate to discourage distribution companies from purchasing cheap gas directly at the wellhead. To eliminate this problem, Order No. 436 makes certification to provide pipeline transportation services conditional on a pipeline company's agreement to permit its firm-sales customers to convert their entitlement to purchase and receive a particular amount of gas from the pipeline into an entitlement merely to transport a "volumetrically equal amount" of gas. *See* 18 C.F.R. § 284.10(c)(1).[3]

During the comment period for Order No. 436, pipeline companies expressed concern over how this conversion right would affect demand for pipeline capacity. Notwithstanding the right of customers effectively to withdraw from long-term firm-demand contracts, pipeline companies remain obligated—contractually and otherwise, *see Associated Gas Distribs.*, 824 F.2d at 1013—to satisfy the demand of those customers who choose to continue to purchase their gas from the pipelines. In promulgating Order No. 436, the Commission reasoned that "unbundling" the transportation and merchant functions of the pipelines

would not interfere with the pipeline companies' legal obligation to service their remaining sales customers, because any customer exercising its conversion right would have "*already* booked the transportation capacity currently 'bundled' with" its entitlement to receive a particular amount of gas. Order No. 436, F.E.R.C. Stats. & Regs., Regulations Preambles 1982–1985 ¶ 30,665, at 31,517.

The Commission subsequently recognized, however, "that in some cases a customer w[ould] seek[ ] to use different segments of the pipeline system," thus potentially interfering with a pipeline's ability to meet its remaining firm-sales obligations. The Commission therefore announced that allocation problems would "be dealt with on a case-by-case basis." Order No. 436–A, F.E.R.C. Stats. & Regs., Regulations Preambles 1982–1985 ¶ 30,675, at 31,664. The Commission has subsequently made clear through adjudication that a pipeline "company [may] impose reasonable operating conditions" on a customer's conversion right in order effectively to manage pipeline capacity. *ANR Pipeline Co.*, 39 F.E.R.C. ¶ 61,029, at 61,072 (1987); *see also Columbia Gulf Transmission Co.*, 34 F.E.R.C. ¶ 61,408, at 61,775 (1986).[4]

### B. *Proceedings Before the Commission*

On March 28 and March 30, 1988, Panhandle filed for Commission approval a series of tariff schedules relating to the conversion rights of Panhandle's customers. The major issue addressed by the tariffs was allocation of pipeline capacity.[5] The "integrated Panhandle system"—to use Panhandle's language—consists of Panhandle's own "West End" pipeline originating

---

**2.** In addition to the demand charge, customers must pay a "commodity charge" based on the exact volume of gas consumed. *See id.*

**3.** Section 284.10(c)(1) provides:
An interstate pipeline subject to this section agrees to offer, and is deemed to offer, every firm sales customer the option ... to convert a portion of its firm sales entitlements under any eligible firm sales service agreement to a volumetrically equal amount of firm transportation service.

**4.** To facilitate pipeline adjustment, Order 436 also provides that customer conversion rights are to be phased in over a five-year period as follows: year one, 15%; year two, 30%; year three, 50%; year four, 75%; and year five, 100%. *See* 18 C.F.R. § 284.10(3).

**5.** The tendered tariffs also proposed limiting the "receipt points" for gas shipped on behalf of transportation customers, a question resolved to Panhandle's satisfaction in the proceedings below.

in Kansas,[6] and Trunkline's pipeline originating in the Gulf of Mexico. The two systems converge in Tuscola, Illinois, from which Panhandle serves customers throughout the Midwest. *See* Joint Appendix ("J.A.") 61–62.[7] Panhandle asserted before the Commission that it would be unable to meet its contract-demand obligations if forced to accommodate all transportation conversion requests solely on its West End line. *See id.* 43. It therefore proposed in its tariff that its customers' conversion entitlements be apportioned between West End and Trunkline on a 61:39 ratio, consistent with the percentage of gas contributed by each to the Panhandle line serving customers east of Tuscola. *See id.* 21. A customer's unused transportation entitlement on Trunkline would, on request, be honored on the West End pipeline on a first-come, first-served basis, as capacity became available. *See id.*

The Commission summarily rejected Panhandle's tendered tariffs, ruling that "Panhandle must provide capacity on its West End System for all conversions up to that system's capacity." *Panhandle E. Pipeline Co.*, 43 F.E.R.C. ¶ 61,530, at 62,318 (1988).[8] Panhandle's proposal to allocate transportation capacity between West End and Trunkline, the Commission found, was "unjust and unreasonable" because it denied Panhandle's customers access to the major gas wells served by the West End line. *See id.* at 62,318. "In addition," the Commission announced, "capacity brokering is not allowed under current policy." *Id.* Finally, the Commission reasoned that Panhandle's attempt "to force customers to use Panhandle's capacity on Trunkline" distinguished the major precedent relied on by Panhandle, *Columbia Gulf Transmission Co.*, 34 F.E.R.C. ¶ 61,408 (1986). *Panhandle E. Pipeline Co.*, 43 F.E.R.C. at 62,318.

## II. ANALYSIS

### A. *Change in Governing Law*

■ During the pendency of this appeal, the Commission revised one of the legal norms supporting its rejection of Panhandle's tariffs: FERC's policy against "capacity brokering." Capacity brokering is the practice whereby a party entitled to transportation services on a particular pipeline assigns or "brokers" that entitlement to another party; in this case, the Commission rejected Panhandle's tariffs on the ground that Panhandle was proposing to assign a fraction of its transportation entitlement on Trunkline's pipeline to Panhandle customers who exercise their transportation-conversion rights. Following the issuance of its decision in this case, however, the Commission has indicated through adjudication that it now "believes that capacity brokering ... should be addressed in individual cases," and even "encourage[d]" in appropriate circumstances. *Interstate Natural Gas Pipeline Rate Design*, 48 F.E.R.C. ¶ 61,122, at 61,448 n. 64 (July 27, 1989); *see, e.g., United Gas Pipe Line Co.*, 46 F.E.R.C. ¶ 61,060, at 61,263 (January 24, 1989).

Because we cannot determine how FERC's change in policy affects the status of Panhandle's tariffs, we are obliged to remand the case for further proceedings. *See NLRB v. Food Store Employees Union, Local 347*, 417 U.S. 1, 10 & n. 10, 94 S.Ct. 2074, 2080 & n. 10, 40 L.Ed.2d 612 (1974). Such a disposition represents the intersection of two well-established doctrines. The first holds that an appellate court must consider the law in effect at the time it renders its decision, even when a change in governing law is made by an administrative agency. *See Thorpe v.*

---

**6.** The West End line, it appears, also carries some gas from wells in Texas, Oklahoma, Colorado and Wyoming. *See* Brief of Petitioner Panhandle Eastern Pipeline Co. ("Brief of Petitioner") at 3.

**7.** Although it is not clear from the record, Panhandle acknowledged at oral argument that the West End line also serves gas customers west of Tuscola.

**8.** The Commission initially rejected the tariffs as ambiguous, *see Panhandle E. Pipeline Co.*, 43 F.E.R.C. ¶ 61,121, at 61,376–77 (1988), but agreed on petition for rehearing that they were sufficiently clear to permit the Commission to rule on their substance, *see* 43 F.E.R.C. at 62,-317.

*Housing Auth.,* 393 U.S. 268, 281, 282, 89 S.Ct. 518, 525, 526, 21 L.Ed.2d 474 (1969).[9] The second holds that a reviewing court may "not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Thus, because we are at liberty neither to evaluate the Commission's decision under FERC's *old* policy on capacity brokering nor to assess on our own how Panhandle's tariffs would fare under FERC's *new* policy, we are required to remand so that the Commission may indicate how, if at all, its decision would be affected by its intervening policy change.[10]

■ In reaching this result, we are constrained to express our dismay with the Commission's failure to mention the revision of its capacity-brokering policy in its brief to the court. Counsel for FERC acknowledged the change only when directly confronted with the pertinent FERC decisions at oral argument. We expect more from Government counsel. When an agency changes a policy or rule underlying a decision pending review, the agency should immediately inform the court and should either move on its own for a remand, *cf. Farmers Union Central Exch. v. FERC,* 584 F.2d 408, 416 n. 22 (D.C.Cir.), *cert. denied,* 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978), or explain how its decision can be sustained independently of the policy in question.[11]

**9.** An exception to this rule exists when applying the former law is necessary "to prevent manifest injustice." *Id.* at 282, 89 S.Ct. at 526. This exception is not applicable in this case. *See generally Bradley v. School Bd.,* 416 U.S. 696, 716–21, 94 S.Ct. 2006, 2018–21, 40 L.Ed.2d 476 (1974).

**10.** The Commission will need to determine, for example, "whether giving the change retrospective effect will best effectuate the policies underlying" the pertinent regulations, *Food Store Employees Union,* 417 U.S. at 10 n. 10, 94 S.Ct. at 2080 n. 10, and, if so, how the Commission's new policy applies to Panhandle's tariffs. However the Commission resolves the issue on remand, moreover, the Commission will be

## B. The Merits

After conceding at oral argument that FERC's policy on capacity brokering no longer supports FERC's rejection of Panhandle's tariffs, counsel for the Commission suggested that we view the agency's decision as resting on the alternative ground that the tariffs violated Order 436's open-access policy. Although we are skeptical that the rationales articulated by the Commission below constitute genuinely independent grounds for its rejection of Panhandle's tariffs, we have no question that so reading FERC's decision would not save the disputed orders from reversal. In order to remove any doubts concerning the adequacy of the orders considered independently of the Commission's evolving standards on capacity brokering, we will therefore address the merits of Panhandle's petition.

■ Review of the Commission's action in this case is governed by the "arbitrary and capricious" standard of section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982).[12] *See Michigan Consolidated Gas Co. v. FERC,* 883 F.2d 117, 120 (D.C.Cir.1989). Under this standard, FERC must engage in "reasoned decisionmaking," *ANR Pipeline Co. v. FERC,* 771 F.2d 507, 516 (D.C.Cir.1985), taking a " ' "hard look" at the salient problems' " before it, *Consolidated Edison Co. v. FERC,* 823 F.2d 630, 637 (D.C.Cir.1987) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)), and offering "reasoned

obliged to reconcile its holding on capacity brokering with FERC precedent allowing pipelines to condition their customers' transportation conversion rights in order efficiently to manage pipeline capacity. *See* Part II.B. *infra.*

**11.** We are also perplexed by the failure of petitioner's counsel to alert us in either the petitioner's brief or at oral argument to the change in the Commission's capacity-brokering policy.

**12.** "[T]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…." 5 U.S.C. § 706(2)(A).

explanation" for any " '[d]ivergence from agency precedent,' " *Michigan Consol. Gas Co.*, 883 F.2d at 122 (quoting *Cross–Sound Ferry Servs., Inc. v. ICC*, 873 F.2d 395, 398 (D.C.Cir.1989)). *See generally State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866. The disputed orders do not pass this test.

The Commission argues that it was entitled summarily to reject Panhandle's tariffs because the tariffs, on their face, violated FERC regulations and policies. According to the Commission, 18 C.F.R. § 284.10(c) allows a customer of a pipeline to convert to transportation service "its *existing firm sales* entitlement under any eligible firm sales service agreement *with that pipeline.*" Brief for Respondent Federal Energy Regulatory Commission ("Brief for Respondent") at 15. The Commission also notes that Order 436 embodies a general policy favoring "open-access" to pipeline transportation services. *See id.* at 15–17.[13] Pointing to the general deference that courts must afford an agency's interpretation of its own regulations, the Commission concludes that it was entitled to construe the regulations in question to prohibit Panhandle from limiting requests for converted transportation capacity on its West End line or from assigning a fraction of its customers' conversion entitlements to the pipeline of another company—Trunkline.

The problem with the Commission's argument is that it fails to come to terms with the Commission's regulations and policies permitting pipelines to "impose reasonable operational conditions" on transportation services in order effectively to manage pipeline capacity. 18 C.F.R. § 284.8(c). In *Columbia Gulf Transmission Co.*, 34 F.E.R.C. ¶ 61,408 (1986)—the major case relied on by Panhandle—the Commission approved on this basis[14] a settlement designed to address capacity problems similar to those allegedly presented in this case.

In *Columbia Gulf*, Columbia Gas, a pipeline company dependent on five upstream lines, including that of its affiliate Columbia Gulf, proposed to limit and allocate customers' conversion entitlements on Columbia Gulf in order to protect Columbia Gas' ability to meet its firm-sales obligations. *See* 34 F.E.R.C. at 61,769. The Commission approved this proposal as a temporary measure,[15] reasoning that "it was never contemplated that the Columbia Gulf system would or could alone meet all of the firm requirements for natural gas on the Columbia Gas system." 34 F.E.R.C. at 61,775. Before the Commission, Panhandle similarly argued that it was never contemplated that Panhandle's West End line would alone meet all the firm-sales commitments of the Panhandle system and that Panhandle is therefore entitled to impose conditions on the conversion entitlements of its customers. *See* J.A. 43.

Two bases for distinguishing the reasonable-conditions exception generally and *Columbia Gulf* in particular arguably can be teased from the Commission's brief and from its opinion below. The first possible distinction is factual. Commission counsel argues that *Columbia Gulf* was decided in "the narrow context of the unique situation presented there, where the facts showed that allocating Columbia Gas' customers a larger share of the capacity on Columbia Gulf's system would have inevitably denied other firm customers the service to which they were entitled." Brief for Respondent at 20. "[I]f Panhandle lacks the capacity on its own system to" honor its customers' conversion entitlements, the Commission now maintains, "it should proceed to make a showing that it lacks such capacity." Brief for Respondent at 19; *see id.* at 16 (making same argument and citing *ANR*

---

**13.** This policy is embodied in 18 C.F.R. § 284.8(b) (1988), which mandates that pipelines certified to provide transportation services must "provide such service without undue discrimination, or preference."

**14.** *Columbia Gulf* did not expressly rely on section 284.8(c), but the Commission has so construed the case subsequently. *See, e.g., ANR*

*Pipeline Co.*, 39 F.E.R.C. ¶ 61,029, at 61,072 (1987).

**15.** The Commission initially approved the settlement for a year but subsequently extended it for two additional six-month periods. *See Columbia Gulf Transmission Co.*, 42 F.E.R.C. ¶ 61,426 (1988); *Columbia Gulf Transmission Co.*, 44 F.E.R.C. ¶ 61,443 (1988).

*Pipeline Co.*, 39 F.E.R.C. ¶ 61,029, at 61,-072 (1987)).

This alleged distinction cannot survive scrutiny under the arbitrary-and-capricious standard of review. The Commission's opinion below made no attempt factually to distinguish *Columbia Gulf*, and the belated attempt to do so now constitutes nothing more than "appellate counsel's *post hoc* rationalization[ ] for agency action." *State Farm*, 463 U.S. at 50, 103 S.Ct. at 2870. Indeed, by disposing of Panhandle's tariffs summarily, the Commission denied Panhandle any opportunity to make a "showing" that it lacks sufficient capacity on its West End line to honor its customers' conversion entitlements.[16]

The second possible distinction is legal. In addition to citing the Commission's then "current policy" against capacity brokering, FERC's opinion says that Panhandle's allocation proposal effectively "forces" Panhandle's customers to take a fraction of their entitlements on the Trunkline line, thereby excluding them from the wellhead markets served by the West End line. *See* 43 F.E.R.C. ¶ 61,530, at 62,318. The Commission presumably meant to distinguish *Columbia Gulf* on this ground, noting that "capacity on Columbia Gulf was not to be used in lieu of Columbia Gas' own capacity." *Id.*

This alleged legal distinction also is plainly insufficient to support the Commission's decision. As counsel conceded at oral argument, the Commission simply misread *Columbia Gulf.* That case squarely endorsed allocating conversion entitlements between distinct pipelines in order to address capacity-related problems associated with implementing Order 436's conversion entitlements. None of the grounds relied upon by the Commission explains FERC's

departure from this practice. Moreover, the settlement approved in *Columbia Gulf* not only allocated capacity *between* pipelines, but also *reduced* customers' transportation entitlements on a *particular* pipeline in order to protect Columbia Gas' ability to meet its firm-sales obligations. Panhandle, too, is seeking to reduce its customers' entitlement on its West End line so that Panhandle can reserve the capacity it needs to serve its firm-sales customers. The disputed orders failed to offer *any* explanation—reasoned or otherwise—concerning why *Columbia Gulf* does not govern this aspect of Panhandle's tariffs.

The failure to address Panhandle's alleged capacity problems also undermines the Commission's conclusion that Panhandle's proposed allocation scheme "forces" Panhandle's customers to use Trunkline in violation of Order No. 436's "open-access" policy. It is true that the scheme provides strong incentives for the customers to satisfy a fraction of their transportation entitlement on the Trunkline line, for they will effectively lose thirty-nine percent of their conversion entitlement if they decline to do so.[17] But the Commission's conclusion that this result constitutes coercion in violation of FERC's nondiscrimination regulations, *see* 18 C.F.R. § 284.8(b), presupposes that Panhandle is *not* entitled to limit capacity on its West End line as a reasonable operating condition. If Panhandle, like the pipeline in *Columbia Gulf*, is entitled under FERC regulations and policies to reduce its customers' entitlement on the West End line, then the proposed reallocation to Trunkline, far from *limiting* the customers' choices, actually *expands* them. Because this ground of the Commission's decision "assumes away the problem" of Panhandle's alleged capacity limitations, *Associated Gas Distribs.*, 824 F.2d at 1024,

---

**16.** In both *Columbia Gulf, see* 34 F.E.R.C. at 61,769, and *ANR Pipeline, see* 39 F.E.R.C. at 61,068—the main case relied on by the Commission—the Commission's orders were issued only after informal "technical conferences" and formal hearings in which the Commission developed a factual record.

**17.** The customers' right under Panhandle's tariff to apply on a first-come, first-served basis for additional space on the West End line in fact puts the customers in the same position as any other party seeking to obtain transportation services on that pipeline. *See Associated Gas Distribs.*, 824 F.2d at 996 (Order 436 imposes first-come, first-served rule).

it does not qualify as reasoned decision-making.[18]

In sum, the orders in this case are arbitrary and capricious because the Commission "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866: how implementation of the transportation-conversion entitlements on the West End line would affect Panhandle's ability to satisfy its firm-sales obligations. The Commission has recognized that the transportation-conversion component of Order 436 may interfere with pipelines' abilities to honor their firm-sales commitments, and has opted to address allocation problems on a case-by-case basis. *See* Order No. 436–A, F.E.R.C. Stats. & Regs., Regulations Preambles 1982–1985 ¶ 30,675, at 31,664. Nonetheless, in this case, the Commission has studiously avoided addressing Panhandle's capacity limitations. There may be reasons—factual or legal—to reject Panhandle's tariffs, but such reasons are not to be found in the disputed orders.[19] "[A] court is not to substitute its judgment for that of the agency" in conducting arbitrary-and-capricious review, *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866, but when the agency has—as in this case—declined to exercise any judgment of its own, the court has little choice but to remand.

### III. CONCLUSION

Because the Commission has revised one of the grounds on which its decision rested and because the remaining grounds do not reflect reasoned decisionmaking, we reverse and remand for further proceedings. On remand, the Commission should determine how, if at all, its new policy on capacity brokering affects the status of Panhandle's tariffs. It should also re-examine its determination that Panhandle's tariffs cannot be justified on the basis of FERC regulations and precedents authorizing pipelines to impose "reasonable operating conditions" on their customers' transporation-conversion entitlements. Should the Commission again reach the conclusion that these authorities are distinguishable, it must explain this conclusion in more comprehensible terms than it did in the orders we have reviewed today.[20]

*It is so ordered.*

**18.** We do not mean to suggest, however, that the Commission would not have been free to reject Panhandle's tarriffs on this basis *had* the Commission determined that Panhandle faced no capacity problem justifying a reduction in its customers' conversion entitlements. Consequently, the Commission on remand remains free to revisit the question of whether Panhandle's tariffs "force" customers to take a portion of their conversion entitlement on Trunkline's pipeline.

**19.** During oral argument, for example, counsel for the Commission argued that because Order 436 phases in Panhandle's customers' conversion rights over a five-year period, *see* 18 C.F.R. § 284.10(3), Panhandle could not demonstrate an immediate capacity problem. Counsel also pointed out that Panhandle's tariffs would apply to firm-sales customers being served on the West End line west of Tuscola, even though permitting those customers to convert 100% of their entitlements on the West End line could not affect Panhandle's ability to serve its remaining firm-sales customers east of Tuscola. These arguments may indeed be compelling ones, but absent findings to this effect below, we are powerless to affirm the Commission's order on this basis. *See State Farm*, 463 U.S. at 50, 103 S.Ct. at 2870. Of course, nothing in our decision today forecloses consideration of these issues on remand.

**20.** Panhandle requests that we instruct the Commission to afford Panhandle an "evidentiary hearing" on remand. Our case law does not mandate such a disposition, *see, e.g., General Motors v. FERC*, 656 F.2d 791, 798 (D.C.Cir. 1981); given the posture of this case, we prefer to leave to FERC's discretion—subject to appropriate review by this court—what procedures are necessary to develop a record sufficient to permit the Commission to act on Panhandle's tariffs. *See generally Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 544, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).