Opinion for the Court filed by Circuit Judge BROWN.
Opinion dissenting in part filed by Cii'cuit Judge GARLAND.
BROWN, Circuit Judge:
FedEx Ground Package System, Inc. (“FedEx”), a company that provides small package delivery throughout the country, seeks review of the determination of the National Labor Relations Board (“Board”) that FedEx committed an unfair labor practice by refusing to bargain with the union certified as the collective bargaining representative of its Wilmington, Massachusetts drivers. The Board cross-applies for enforcement of its order. Because the drivers are independent contractors and not employees, we grant FedEx’s petition, vacate the order, and deny the cross-application for enforcement
I.
In 1998, FedEx acquired Roadway Package Systems and changed its name to FedEx Ground Package System, Inc. The company has two operating divisions: the Ground Division and the Home Delivery Division or FedEx Home. The Ground Division delivers packages of up to 150 pounds, principally to and from business customers. FedEx Home delivers packages of up to 75 pounds, mostly to residential customers. The Wilmington terminals are part of FedEx Home, a network that operates 300 stand-alone terminals throughout the United States and shares space in an additional 200 Ground Division facilities. FedEx Home has independent contractor agreements with about 4,000 contractors nationwide with responsibility for over 5,000 routes.
In July 2006, the International Brotherhood of Teamsters, Local Union 25, filed two petitions with the NLRB seeking representation elections at the Jewel Drive and Ballardvale Street terminals in Wilmington, neither of which boasts many contractors. The Union won the elections, prevailing by a vote of 14 to 6 at Jewel Drive and 10 to 2 at Ballardvale Street, and was certified as the collective bargaining representative at both. FedEx refused to bargain with the Union. The company did not contest the vote count; instead, FedEx disputed the preliminary finding that its single-route drivers are “employees” within the meaning of Section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3).
The Board rejected FedEx’s Request for Review of the Regional Director’s Decision and Direction of Election on November 8, 2006. In dissent, Chairman Battista disagreed with “the refusal to permit [FedEx] to introduce system-wide evidence concerning the number of route sales and the amount of profit,” as the information would be relevant to the determination of the drivers’ “entrepreneurial interest in their position.” FedEx Home Delivery and Local 25, N.L.R.B. Case Nos. 1-RC-22034, 22035, (Nov. 8, 2006) (Battista, C., dissenting). After the election, the Board found FedEx violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain. Finding FedEx’s objection that its contractors are not employees had been raised and rejected in the representation proceedings, the Board issued its order on September 28, 2007. FedEx filed a timely petition for review and the Board filed its cross-application for enforcement. The Union intervened in support of the Board’s cross-application.
II.
To determine whether a worker should be classified as an employee or an *496 independent contractor, the Board and this court apply the common-law agency test, a requirement that reflects clear congressional will. See NLRB v. United Ins. Co., 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); see also St. Joseph News Press, 345 N.L.R.B. 474, 478 (2005) (“Supreme Court precedent ‘teaches us not only that the common law of agency is the standard to measure employee status but also that we have no authority to change it.’ ”) (quoting Dial-A-Mattress Operating Corp., 326 N.L.R.B. 884, 894 (1998)). While this seems simple enough, the Restatement’s non-exhaustive ten-factor test is not especially amenable to any sort of bright-line rule,[1] a long-recognized rub.[2] Thus, “there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive,” United Ins. Co., 390 U.S. at 258, 88 S.Ct. 988, always bearing in mind the “legal distinction between ‘employees’ ... and ‘independent contractors’ ... is permeated at the fringes by conclusions drawn from the factual setting of the particular industrial dispute.” North Am. Van Lines, Inc. v. NLRB, 869 F.2d 596, 599 (D.C.Cir.1989) (“NAVL ”).
This potential uncertainty is particularly problematic because the line between worker and independent contractor is jurisdictional — the Board has no authority whatsoever over independent contractors. See id. at 598. Consequently, it is “one of this court’s principal functions” to “ensur[e] that the Board exercises power only within the channels intended by Congress,” especially as determining status from undisputed facts “involves no special administrative expertise that a court does not possess.” Id. We thus do not grant great or even “normal[ ]” deference to the Board’s status determinations; instead, we will only uphold the Board if at least “it can be said to have ‘made a choice between two fairly conflicting views.’” C.C. Eastern, Inc. v. NLRB, 60 F.3d 855, 858 (D.C.Cir.1995) (quoting NAVL, 869 F.2d at 599).
For a time, when applying this common law test, we spoke in terms of an employer’s right to exercise control, making the extent of actual supervision of the means and manner of the worker’s performance a key consideration in the totality of the circumstances assessment. Though all the common law factors were considered, the meta-question, as it were, focused on the sorts of controls employers could use without transforming a contractor into an employee. E.g., NAVL, 869 F.2d at 599 (“In applying traditional agency law principles, the NLRB and the courts have adopted a right-to-control test. The test requires an evaluation of all the circumstances, but the extent of the actual supervision exercised ... is the most important element.”). For example, “efforts to monitor, evaluate, and *497 improve” a worker’s performance were deemed compatible with independent contractor status. Id. Nor would “restrictions” resulting from “government regulation” mandate a contrary conclusion. Id. “[EJvidence of unequal bargaining power” also did not establish “control.” Id.
Gradually, however, a verbal formulation emerged that sought to identify the essential quantum of independence that separates a contractor from an employee, a process reflected in cases like C.C. Eastern and NAVL where we used words like control but struggled to articulate exactly what we meant by them. “Control,” for instance, did not mean all kinds of controls, but only certain kinds. See, e.g., C.C. Eastern, 60 F.3d at 858 (quoting NAVL, 869 F.2d at 599). Even though we were sufficiently confident in our judgment that we reversed the Board, long portions of both opinions were dedicated to explaining why some controls were more equal than others. See id. at 858-61; NAVL, 869 F.2d at 599-604. In other words, “control” was close to what we were trying to capture, but it wasn’t a perfect concurrence. It was as if the sheet music just didn’t quite match the tune.
In any event, the process that seems implicit in those cases became explicit — indeed, as explicit as words can be-in Corporate Express Delivery Systems v. NLRB, 292 F.3d 777 (D.C.Cir.2002). In that case, both this court and the Board, while retaining all of the common law factors, “shift[ed the] emphasis” away from the unwieldy control inquiry in favor of a more accurate proxy: whether the “putative independent contractors have ‘significant entrepreneurial opportunity for gain or loss.’ ” Id. at 780 (quoting Corp. Express Delivery Sys., 332 N.L.R.B. No. 144, at 6 (Dec. 19, 2000)). This subtle refinement was done at the Board’s urging in light of a comment to the Restatement that explains a “ ‘full-time cook is regarded as a servant,’ ” — and not “an independent contractor” — “ ‘although it is understood that the employer will exercise no control over the cooking.’ ” Id. (quoting Restatement (Second) of Agency § 220(1) cmt. d). Thus, while all the considerations at common law remain in play, an important animating principle by which to evaluate those factors in cases where some factors cut one way and some the other is whether the position presents the opportunities and risks inherent in entrepreneurialism. Id[3] Although using this “emphasis” does not make applying the test purely mechanical, the line drawing is easier, or at least this court and the Board in Corporate Express seem to have so hoped. See id. (“We agree with the Board’s suggestion that [entrepreneurial opportunity] better captures the distinction between an employee and an independent contractor.”). In C.C. Eastern, for instance, we decided drivers for a cartage company who owned their own tractors, signed an independent contractor agreement, “retainfed] the rights, as independent entrepreneurs, to hire their own employees” and could “use their tractors during non-business hours,” and who were “paid by the job” and received no employee benefits, should be characterized as independent contractors. 60 F.3d at 858-59. We also noted the company did *498 not require “specific work hours” or dress codes, nor did it subject workers to conventional employee discipline. Id. at 858. Conversely, in Corporate Express, emphasizing entrepreneurialism, we straightforwardly concluded that where the owner-operators “were not permitted to employ others to do the Company’s work or to use their own vehicles for other jobs,” they “lacked all entrepreneurial opportunity and consequently functioned as employees rather than as independent contractors.” 292 F.3d at 780-81.
This struggle to capture and articulate what is meant by abstractions like “independence” and “control” also seems to play a part in the Board’s own cases, though we readily concede the Board’s language has not been as unambiguous as this court’s binding statement in Corporate Express. For instance, in the latest but far from only statement of the principle, see St. Joseph News Press, 345 N.L.R.B. at 479; Dial-A-Mattress Operating Corp., 326 N.L.R.B. at 891; cf. Panhandle E. Pipe Line Co. v. FERC, 890 F.2d 435, 438-39 (D.C.Cir.1989) (agency action while review is pending in this court can be relevant), and a case where the Board explicitly said it was simply following its own precedent, Arizona Republic, 349 N.L.R.B. 1040, 1040 (2007), the Board held that where carriers sign an independent contractor agreement; own, maintain, and control their own vehicles; hire full-time substitutes and control the substitutes’ terms and conditions of employment; are permitted to hold contracts on multiple routes; select the delivery sequence; and are not subject to the employer’s progressive discipline system, the evidence establishes that the carriers are independent contractors, id. at 1040-41, 1046. Importantly, the Board, noting many drivers had “multiple routes” and could deliver newspapers for another publisher, also concluded significant entrepreneurial opportunity existed, even if most failed to make the extra effort. “[T]he fact that many carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial potential to do so.” Id. at 1045.
The record here shares many of the same characteristics of entrepreneurial potential.[4] In the underlying representation decision, the Regional Director found the contractors sign a Standard Contractor Operating Agreement that specifies the contractor is not an employee of FedEx “for any purpose” and confirms the “manner and means of reaching mutual business objectives” is within the contractor’s discretion, and FedEx “may not prescribe hours of work, whether or when the contractors take breaks, what routes they follow, or other details of performance”; “contractors are not subject to reprimands or other discipline”; contractors must provide their own vehicles, although the vehicles must be compliant with government regulations and other safety requirements; and “contractors are responsible for all the costs associated with operating and maintaining their vehicles.” FedEx Home Delivery and Local 25, N.L.R.B. Case Nos. 1-RC-22034, 22035, slip op. at 10-14 (First Region, Sept. 20, 2006) (“Representation Decision”). They may use the vehicles “for other commercial or personal purposes ... so long as they remove or mask all FedEx Home logos and markings,” and, even on this limited record, some do use *499 them for personal uses like moving family members, and in the past “Alan Douglas[ ] used his FedEx truck for his ‘Douglas Delivery’ delivery service, in which he delivered items such as lawn mowers for a repair company.” Id. at 14, 15. Contractors can independently incorporate, and at least two in Wilmington have done so. At least one contractor has negotiated with FedEx for higher fees. Id. at 20.[5]
Tellingly, contractors may contract to serve multiple routes or hire their own employees for their single routes; more than twenty-five percent of contractors have hired their own employees at some point. See Resp’ts Br. at 6. “The multiple route contractors have sole authority to hire and dismiss their drivers”; they are responsible for the “drivers’ wages” and “all expenses associated with hiring drivers, such as the cost of training, physical exams, drug screening, employment taxes, and work accident insurance.” Representation Decision, slip op. at 27.[6] The drivers’ pay and benefits, as well as responsibility for fuel costs and the like, are negotiated “between the contractors and their drivers.” Id. In addition, “both multiple and single route contractors may hire drivers” as “temporary” replacements on their own routes; though they can use FedEx’s “Time Off Program” to find replacement drivers when they are ill or away, they need not use this program, and not all do. Id. at 28-29. Thus, contrary to the dissent’s depiction, Dis. Op. at 513, contractors do not need to show up at work every day (or ever, for that matter); instead, at their discretion, they can take a day, a week, a month, or more off, so long as they hire another to be there. “FedEx [also] is not involved in a contractor’s decision to hire or terminate a substitute driver, and contractors do not even have to tell FedEx [ ] they have hired a replacement driver, as long as the driver is ‘qualified.’ ” Representation Decision, slip op. at 29. “Contractors may also choose to hire helpers” without notifying FedEx at all; at least six contractors in Wilmington have done so. Id. at 29-30. This ability to hire “others to do the Company’s work” is no small thing in evaluating “entrepreneurial opportunity.” Corp. Express, 292 F.3d at 780-81; see also St. Joseph News Press, 345 N.L.R.B. at 479 (“Most importantly, the carriers can hire full-time substitutes.... ”).
*500 Another aspect of the Operating Agreement is significant, and is novel under our precedent. Contractors can assign at law their contractual rights to their routes, without FedEx’s permission. The logical result is they can sell, trade, give, or even bequeath their routes, an unusual feature for an employer-employee relationship. In fact, the amount of consideration for the sale of a route is negotiated “strictly between the seller and the buyer,” with no FedEx involvement at all other than the new route owner must also be “qualified” under the Operating Agreement, Representation Decision, slip op. at 30, with “qualified” merely meaning the new owner of the route also satisfies Department of Transportation (“DOT”) regulations, see id. at 8-10. Although FedEx assigns routes without nominal charge, the record contains evidence, as the Regional Director expressly found, that at least two contractors were able to sell routes for a profit ranging from $3,000 to nearly $16,000. See id. at 30-32, 38-39.
In its argument to this court, the Board, echoed by the dissent, discounts this evidence of entrepreneurial opportunity by saying any so-called profit merely represents the value of the vehicles, which were sold along with the routes. But if a vehicle depreciates in value, it is not worth as much as it was before; that is tautological. Here, buyers paid more for a vehicle and route than just the depreciated value of the vehicle — in one instance more than $10,000 more. Therefore, as the Regional Director did, we find this value is profit. Compare Representation Decision, slip op. at 38' (“Neal’s profit on the sale of his route was only $3000 to $6000,” and “[a]fter deducting the value of the truck ... it appears that, at best, Ferreira paid Jung somewhere between $11,000 and $16,000 for the route.”) with Dis. Op. at 516 (suggesting no “gain at all” may have been shown). The amount of profit may be “murky,” as it may be as high as $6,000 and $16,000 or as low as $3,000 or $11,000, respectively, but the profit is real. Representation Decision, slip op. at 38. That this potential for profit exists is unsurprising: routes are geographically defined, and they likely have value dependent on those geographic specifics which some contractors can better exploit than others. For example, as people move into an area, the ability to profit from that migration varies; some contractors using more efficient methods can continue to serve the entire route, while others cannot.
It is similarly confused to conclude FedEx gives away routes for free. See Dis. Op. at 515. A contractor agrees to provide a service in return for compensation, i.e., both sides give consideration. If a contractor does not do what she says, FedEx suffers damages, just as she does if FedEx does not pay what is owed. Servicing a route is not cheap; one needs a truck (which the contractor pays for) and a driver (which the contractor also pays for, either directly or in kind). To say this is giving away a route 'is to say when one hires a contractor to build a house, one is just giving away a construction opportunity. All of this evidence thus supports finding these contractors to be independent.
The Regional Director, however, thought FedEx’s business model distinguishable from those where the Board had concluded the drivers were independent contractors. For example, FedEx requires: contractors to wear a recognizable uniform and conform to grooming standards; vehicles of particular color (white) and within a specific size range; and vehicles to display FedEx’s logo in a way larger than that required by DOT regulations. The company insists drivers complete a driving course (or have a year of commercial driving experience, which need not be with FedEx) and be insured, and it *501 “conducts two customer service rides per year” to audit performance. FedEx provides incentive pay (as well as fuel reimbursements in limited instances) and vehicle availability allotments, and requires contractors have a vehicle and driver available for deliveries Tuesday through Saturday. Id. at 508-14. Moreover, FedEx can reconfigure routes if a contractor cannot provide adequate service, though the contractor has five days to prove otherwise, and is entitled to monetary compensation for the diminished value of the route. Id. at 512. These aspects of FedEx’s operation are distinguishable from the business models in Dial-A-Mattress, 326 N.L.R.B. 884 (contractors arranged their own training, could decline work, did not wear uniforms, could use any vehicle, and were provided no subsidies or minimum compensation) and Argix Direct, Inc., 343 N.L.R.B. 1017 (2004) (contractors could decline work, delivered to major retailers using any vehicle, and had no guaranteed income).
But those distinctions, though not irrelevant, reflect differences in the type of service the contractors are providing rather than differences in the employment relationship. In other words, the distinctions are significant but not sufficient. FedEx Home’s business model is somewhat unique. The service is delivering small packages, mostly to residential customers. Unlike some trucking companies, its drivers are not delivering goods that FedEx sells or manufacturers, nor does FedEx move freight for a limited number of large clients. Instead, it is an intermediary between a diffuse group of senders and a broadly diverse group of recipients. With this model comes certain customer demands, including safety. As the Internal Revenue Service (“IRS”) persuasively notes, and ordinary experience confirms, a uniform requirement often at least in part “is intended to ensure customer security rather than to control the [driver].” Internal Revenue Service, Employment Tax Guidelines: Classifying Certain Van Operators in the Moving Industry 23, http:// www.irs.gov/pub/irs-utl/van-ops.pdf (last visited April 3, 2009).[7] And once a driver wears FedEx’s logo, FedEx has an interest in making sure her conduct reflects favorably on that logo, for instance by her being a safe and insured driver — which is required by DOT regulations in any event. See Representation Decision, slip op. at 8-9, 14, 24.
We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship. See C.C. Eastern, 60 F.3d at 859 (“[W]here a company’s control over an aspect of the workers’ performance is motivated by a concern for customer service, that control does not suggest an employment relationship.”); NAVL, 869 F.2d at 599 (“[E]mployer efforts to monitor, evaluate, and improve the results of ends of the worker’s performance do not make the worker an employee.”); id. (“[Restrictions upon a worker’s manner and means of performance that spring from government regulation ... do not necessarily support a conclusion of employment status” because the company “is not controlling the driver,” the law is.). As our “emphasis [shifts] to entrepreneurialism,” Corp. Express, 292 F.3d at 780, these precedents apply a fortiori.
*502 Likewise, “an incentive system designed ‘to ensure that the drivers’ overall performance meets the company standards’ ... is fully consistent with an independent contractor relationship.” C.C. Eastern, 60 F.3d at 860 (quoting NAVL, 869 F.2d at 603). At the same time, a contractual willingness to share a small part of the risk — for instance, by providing fuel reimbursements when prices jump sharply, or by guaranteeing a certain minimum amount of income for making a vehicle available — does not an employee make. See Argix Direct, Inc., 343 N.L.R.B. at 1019 (contractors were independent even though the “[ejmployer also pays the owner-operators a fuel surcharge when the price of fuel surpasses a preset average”).
The Regional Director also emphasized that these “contractors perform a function that is a regular and essential part of FedEx Home’s normal operations, the delivery of packages,” and that few have seized any of the alleged entrepreneurial opportunities. Representation Decision, slip op. at 34, 38. While the essential nature of a worker’s role is a legitimate consideration, it is not determinative in the face of more compelling countervailing factors, see Aurora Packing v. NLRB, 904 F.2d 73, 76 (D.C.Cir.1990), otherwise companies like FedEx could never hire delivery drivers who are independent contractors, a consequence contrary to precedent, see St. Joseph News Press, 345 N.L.R.B. at 479. And both the Board and this court have found the failure to take advantage of an opportunity is beside the point. See C.C. Eastern, 60 F.3d at 860 (opportunities cannot be ignored unless they are the sort workers “cannot realistically take,” and even “one instance” of a driver using such an opportunity can be sufficient to “show[] there is no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right”); Arizona Republic, 349 N.L.R.B. at 1045. Instead, “it is the worker’s retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant for the purpose of determining whether he is an independent contractor.” C.C. Eastern, 60 F.3d at 860.[8]
III.
Our dissenting colleague reads our precedent differently than we do, and thus reaches a different conclusion. Of course the facts in our past holdings are not identical to those here, but there is no reason to distinguish this case from those where we have rejected the Board’s attempt to assert jurisdiction over independent contractors. In fact, this case is relatively straightforward because not only do these contractors have the ability to hire others without FedEx’s participation, only here do they own their routes — as in they can sell them, trade them, or just plain give them away. Moreover, if this court had shown as much deference to the Board as our colleague seems to suggest is its due, we wonder how C.C. Eastern and NAVL could possibly have been decided the way that they were. Because the dispute turns on precedent, we recommend you read our cases — they are quite short— and see for yourself whether our friend’s fight really is with us at all.
The dissent, for instance, argues that emphasizing entrepreneurialism has only truly begun with this case, and suggests we are doing so here for reasons apart *503 from allegiance to precedent. See, e.g., Dis. Op. at 509-10, 518-19. Lest any be confused, we again quote Corporate Express: “[W]e uphold as reasonable the Board’s decision, at the urging of the General Counsel, to focus not upon the employer’s control of the means and manner of the work but instead upon whether the putative independent contractors have a ‘significant entrepreneurial opportunity for gain or loss.’” 292 F.3d at 780. We explicitly “agree[d] with the Board’s suggestion that the latter factor better captures the distinction between an employee and an independent contractor,” because, as reflected by the Restatement’s comment, it is not “the degree of supervision under which [one] labors but ... the degree to which [one] functions as an entrepreneur — that is, takes economic risk and has the corresponding opportunity to profit from working smarter, not just harder,” that better illuminates one’s status. Id. We retained the common law test (as is required by the Court’s decision in United Insurance), but merely “shift[ed our] emphasis to entrepreneurialism,” using this “emphasis” to evaluate common law factors such as whether the contractor “supplies his own equipment,” id. Corporate Express is thus doctrinally consistent with United Insurance and the Restatement.
Likewise, though conceding ours is a “fair reading of [Corporate Express ], which contains considerable language regarding entrepreneurial opportunity and the benefits of using such a test,” the dissent nonetheless argues there is a narrower way to understand that case such that it still focuses on the extent of control. Dis. Op. at 508. Put another way, Corporate Express — despite its seemingly unambiguous language — to him need not be read as evincing a shift towards entrepreneurialism at all. We cannot adopt that reading because the court affirmatively declined to determine the contractors’ status under a “means and manner test.” Corp. Express, 292 F.3d at 780 (“[W]e need not answer that question.... ”). We take Corporate Express at its word.
But even if Corporate Express never happened, the result here is unchanged. While on some points C.C. Eastern and NAVL are distinguishable — for instance, in C.C. Eastern there were no appearance requirements for man or machine (though “the tractor must be suitable for the task at hand”), see 60 F.3d at 859, as in NAVL, 869 F.2d at 600—the overwhelming majority of factors favoring independent contractor status are the same, and, importantly, this case is particularly straightforward because only here can the contractors own and transfer the proprietary interest in their routes. Moreover, all contractors here own their vehicles, something that cannot be said in NAVL, where not even the majority did. See id. True, these drivers- — -who need not be, and not always are, the same persons as the contractors — -must wear uniforms and the like, but a rule based on concern for customer service does not create an employee relationship. See C.C. Eastern, 60 F.3d at 859. And while in C.C. Eastern “we [were] able to find ... only one instance of a driver” using an entrepreneurial opportunity, that lone “example show[ed] that there [was] no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right.” Id. at 860. In this case, we need not and do not rely on just one example of the exercise of rights. Even on an incomplete record there are many such examples; routes have been sold for a profit; substitutes and helpers have been hired without FedEx’s involvement; one contractor has negotiated for higher rates; and contractors have incorporated. Under the fairest reading of our precedent, these are independent contractors.
*504 IV.
We have considered all the common law factors, and, on balance, are compelled to conclude they favor independent contractor status. The ability to operate multiple routes, hire additional drivers (including drivers who substitute for the contractor) and helpers, and to sell routes without permission, as well as the parties’ intent expressed in the contract, augurs strongly in favor of independent contractor status. Because the indicia favoring a finding the contractors are employees are clearly outweighed by evidence of entrepreneurial opportunity, the Board cannot be said to have made a choice between two fairly conflicting views. Though evidence can be marshaled and debater’s points scored on both sides, the evidence supporting independent contractor status is more compelling under our precedent. The evidence might have been stronger still had not the Regional Director erroneously excluded the national data. But even as the record stands, the Board’s determination was legally erroneous.
Accordingly, we grant the petition, vacate the Board’s order, and deny the cross-application for enforcement.

So ordered.

. The common law factors include, inter alia, "the extent of control which, by the agreement, the master may exercise over the details of the work”; "the kind of occupation”; whether the worker "supplies the instrumentalities, tools, and the place of work”; “the method of payment, whether by the time or by the job”; "the length of time for which the person is employed”; whether “the work is a part of the regular business of the employer”; and the intent of the parties. Restatement (Second) of Agency § 220(2).

. See Kisner v. Jackson, 159 Miss. 424, 427-28, 132 So. 90 (1931) ("There have been many attempts to define precisely what is meant by the term ‘independent contractor’; but the variations in the wording of these attempts have resulted only in establishing the proposition that it is not possible within the limitations of language to lay down a concise definition that will furnish any universal formula, covering all cases. At last, and in any given case, it gets back to the original proposition whether in fact the contractor was actually independent.”).

. The common law test, after all, is not merely quantitative. We do not just count the factors that favor one camp, and those the other, and declare that whichever side scores the most points wins. Instead, there also is a qualitative assessment to evaluate which factors are determinative in a particular case, and why. In Corporate Express, we said this qualitative evaluation '‘focus[es] not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.’ ” 292 F.3d at 780 (quoting Corp. Express, 332 N.L.R.B. at 6).

. FedEx also does not provide benefits or withhold taxes. While unrelated to entrepreneurialism, this goes to party intent. See C.C. Eastern, 60 F.3d at 858-59; St. Joseph News Press, 345 N.L.R.B. at 479.("[A] party's intent with regard to the nature of the relationship created weighs strongly in favor of finding independent contractor status.”). Because we consider all the common law factors, vide supra, these facts are relevant, just as are any relating to control.

. We recognize FedEx seeks to "make full use of the Contractor's equipment,” but it is undisputed the contractors are only obligated to provide service five days a week. Our precedent speaks to this: “Moreover, as the drivers work only 40 to 50 hours per week for the Company, it seems that their schedules do not preclude them from taking on additional hauling business during their off-hours.” C.C. Eastern, 60 F.3d at 860. Though our colleague contends C.C. Eastern does not say very much, see Dis. Op. at 516 ("But all C.C. Eastern held was that under those circumstances, the Board had erred in 'discounting to zero’ the significance of that single factor in the traditional multi-factor test.”), he fails to account for the holding. We did not remand for the Board to give this factor the proper weight, but instead held the contractors "are not 'employees’ within the meaning of the Act and therefore are not within the jurisdiction of the Board.” C.C. Eastern, 60 F.3d at 861.

. We are aware the Regional Director excluded contractors with multiple routes from the bargaining units as statutory supervisors, even though the "employees” of those "supervisors” do not, in fact, work for FedEx. Representation Decision, slip op. at 42-43. This classification is not before us. But what is before us is the puzzling argument, adopted but not defended by our colleague, see Dis. Op. at 515, that because they were excluded, everything about them is somehow irrelevant, as if — poof!—they just vanished. Multi-route contractors signed the same contract as the others, and just as the national data is relevant in assessing the rights available under the contract, id. at 517-19, so are the activities of these contractors.

. We, of course, are not deferring to the IRS. See Dis. Op. at 511 n. 10. Our standard of review here is unusual. Though not de novo, we must enforce the bounds on the Board’s jurisdiction set by Congress. NAVL, 869 F.2d at 598. This statement is merely persuasive authority that is relevant in light of our precedent that measures springing from customer demands do not create an employee relationship. C.C. Eastern, 60 F.3d at 859.

. The Regional Director noted too that "FedEx Home offers what is essentially a take-it- or-leave-it agreement.” But we will "draw no inference of employment status from merely the economic controls which many corporations are able to exercise over independent contractors with whom they contract.” NAVL, 869 F.2d at 599.